IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

FRANCIS M. GAVIN,

               Plaintiff,

     v.

HAWORTH, INC.,

               Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 15-180 (JBS/KMW)

**OPINION**

APPEARANCES:

Michelle J. Douglass, Esq.
MY RIGHTS LAWYERS EMPLOYMENT LAW GROUP, LLC
424 Bethel Rd.
Somers Point, NJ 08244
    Attorney for Plaintiff

Mark A. Schiavo, Esq.
DILWORTH PAXSON LLP
Libertyview - Suite 700
457 Haddonfield Rd.
Cherry Hill, NJ 08002
    Attorneys for Defendant

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

In this employment discrimination action, Plaintiff Francis Gavin (hereinafter "Plaintiff" or "Mr. Gavin") brings suit against Defendant Haworth, Inc. (hereinafter "Defendant"), his former employer, claiming that Defendant discriminated against him because of a back-related disability and then failed to accommodate his disability, as well as subjected him to a

hostile work environment, in violation of New Jersey's Law Against Discrimination ("NJLAD").  This case comes before the Court on Defendant's motion for summary judgment. [Docket Item 48.]  For the reasons that follow, the Court will grant in part and deny in part Defendant's motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Gavin's Employment at Haworth

Plaintiff began working at Haworth, a manufacturer of commercial office furniture, as a Global Account Manager in January 2000. (Def. SUMF ¶¶ 1-2.)  In this role, Mr. Gavin sold furniture to end users and to a global network of commercial dealers (id. at ¶ 3.), and a primary responsibility of the position was to "get out into the marketplace and make face-to-face sales calls with customers." (Id. at ¶ 5.)  As a result, he "regularly and customarily [met] with customers at their places of business." (Id.)

In 2006, Mr. Gavin's position changed to Manager of Strategic Global Accounts, which meant that he managed fewer

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment.  The Court disregards, as it must, those portions of the parties' statement of material facts that either lack citation to relevant record evidence (unless admitted by the opponent), or recites factual irrelevances. See generally L. Civ. R. 56.1(a); see also Webster v. Dollar General, Inc., No. 13-690, 2016 WL 3769748, at *2, n.5 (D.N.J. July 14, 2016).

customers, but was now responsible "for being the single point of contract for purchasing decisions by a handful of large, multinational companies." (Id. at ¶ 9-10.) During this time, he reported to Thomas Payton, Vice President of Strategic Global Accounts. (Id. at ¶ 11.)

In early 2012, Payton accepted another position outside of the Global Accounts program, and Mitchell Kantor (hereinafter "Mr. Kantor") took over as the Vice President of Global Accounts. (Id. at ¶ 12.) Then, in August 2012, Mr. Gavin began reporting to a Global Accounts Director, Henry Pizoli (hereinafter "Mr. Pizoli"), who remained Mr. Gavin's supervisor until his separation from Haworth. (Id. at ¶ 13.) Mr. Gavin was "terrified" of having Mr. Pizoli as a boss and what he might do to his accounts because Mr. Gavin "did not trust" Mr. Pizoli and believed Mr. Pizoli was interested only in his own financial well-being. (Id. at ¶¶ 34-36; Gavin Dep. at 103:14-17; 106:9-13) This mistrust primarily emerged from a work-related experience in 2006, in which Mr. Gavin accused Mr. Pizoli of trying to take sales credit for a project he played no role in selling. (Def. SUMF at ¶ 37; Gavin Dep. 106:14 to 111:9.)

## B. Gavin's Back Problems

Mr. Gavin experienced a series of episodes related to his back during his time at Haworth. First, in 2004, he had his tailbone removed after an injury he sustained playing basketball

3

– this required him to miss a few days of work for the surgery and a week for a follow-up procedure. (Id. at ¶¶ 14-15.)  He returned to work with no restrictions. (Def. SUMF at ¶ 16; Gavin Dep. At 85:3-20.)  Then, in 2006, Gavin had a laminectomy surgery at the L4 vertebrae to relieve sciatic pain, and this required him to work from home for a month, but it did not require any work restrictions from his doctor. (Def. SUMF at ¶¶ 17-18).  Mr. Gavin reinjured his back in early 2010 when using a snow blower, and in November of that year, he underwent a percutaneous disc compression surgery to stabilize the vertebrae in his back. (Id. at ¶¶ 19-20.)  Most importantly for this case, in August 2012, Mr. Gavin underwent lumbar spinal fusion surgery to fuse his L3-L4 vertebrae, and this required him to take medical leave of absence and receive short-term disability benefits. (Id. at ¶¶ 23-25; Ex. M to Pl.'s Opp'n.)  Approximately two weeks after the surgery, and as he recovered, Mr. Gavin returned to work gradually under Haworth's transition work program. (Def. SUMF at ¶ 26.)

Defendant directs employees to the Haworth Medical Center on issues related to medical needs and/or accommodations in the workplace. (Id. at ¶ 28.)  Haworth SOP-63.21, Defendant's policy dealing with member requests for accommodation and the transitional work program, was "in effect and was available 24/7 to all Haworth members via the Haworth Hometown webpage."

(Victoria Barnes Decl. at ¶ 3.)  Following his August 2012
surgery, Mr. Gavin did not review Haworth's policies related to
the transitional work program, but he was informed that he
needed to provide regular updates from his physician to the
Haworth Medical Center. (<u>Id.</u> at ¶ 30.)  After approximately 4.5
months of work restrictions following his surgery, on January
15, 2013, Mr. Gavin was released by his doctor to return to work
without restriction. (<u>Id.</u> at ¶¶ 31-33.)  Haworth accommodated
all of his restrictions during this period. (<u>Id.</u> at 34.)

### C. Pizoli Comments about Gavin's Disability

Mr. Gavin alleges that when he returned to work from the
surgery, Mr. Pizoli "frequently" made a series of "hurtful"
comments to him about his back condition. (Gavin Dep. 155:17.)
Even when Mr. Gavin was cleared to return to work without
restriction, he still wore a duragesic patch and was required to
wear a back brace during this time. (Gavin Decl. at ¶ 128.)  Mr.
Pizoli told Mr. Gavin that it "doesn't look good in front of
customers" when "such a fuss" was being made about his "physical
well-being." (Gavin Dep. 147:13-19.)  Mr. Pizoli later voiced
concerns about Mr. Gavin's ability to be "able to work normally
without this [back condition] being the center of attention."
(Gavin Dep. 148:7-12.)  Mr. Pizoli also commented to Mr. Gavin
that he "should have never come back to work [after his

surgery]," as the suggestion that Mr. Gavin should "leave" was a "common refrain." (Gavin Dep. 152:17-18; 155:2-3.)

### D. Gavin's Job Performance Allegedly Declines

Starting in early 2013, Mr. Pizoli began to notice that Mr. Gavin had problems with time management and responsiveness to requests from both Haworth management and customers.  Mr. Gavin received a negative performance review on February 15, 2013, as Mr. Pizoli rated Mr. Gavin's performance as "Needs Development" in three categories, specifically regarding Mr. Gavin's failure to meet his sales quota of $22 million. (Ex. L-13 to Pl.'s Opp'n.)  However, Mr. Pizoli knew that Mr. Gavin "was out of work due to back surgery and was expected to be on light duty until the end of the year." (Gavin Decl. at ¶ 108.)

On March 26, 2013, regarding the lack of submission of a list of performance goals, Mr. Pizoli wrote to Mr. Gavin that "I wish that you would just complete the task on time and that I would not have to consistently remind you to do what is required of your responsibilities," and Mr. Gavin replied, "[y]our point is made and henceforth I will make completing all assignments and paperwork in a timely manner my number one priority." (Ex. 6 to Def. Br.)  On June 18, 2013, Mr. Pizoli sent to Mr. Gavin an email asserting that in the prior six months he had received more concerns about his follow up than the "entire Eastern Global accounts team combined." (Def. RSSDF ¶ 255.)   Mr. Pizoli

received additional complaints from dealers and customers in September 2013 relating to Mr. Gavin's failure to return emails, voicemails, or phone calls. (Ex. B. to Def. Br.)  Mr. Gavin believes that the complaints were "inaccurate" and that Mr. Pizoli was characterizing these complaints "in a manner to reflect poorly upon [him] and to start a process of papering [his] file to get [him] out of the company." (Gavin Dep. 257:25 to 258:3-12.)

Another incident occurred as a result of a September 19, 2013 meeting with TYCO, one of Mr. Gavin's accounts.  Mr. Gavin had previously scheduled a vacation to visit his daughter, but changed his plans at the last minute to accommodate TYCO wanting to meet at Haworth's headquarters in Michigan. (Gavin Dep. 173:1-2; Gavin Decl. at ¶ 292.)  After eventually visiting his daughter after the TYCO meeting, he contracted the Norovirus and ended up in the emergency room and missing several days of work. (Gavin Dep. 175:10-12).  Several customers and Haworth employees complained to Mr. Pizoli about Mr. Gavin's lack of responsiveness during this time period, but Mr. Pizoli "knew that [Mr. Gavin] was sick and hospitalized" during that time (Pizoli Decl. at ¶¶ 19-22; Gavin Decl. at ¶ 304.)  On September 24, 2013, in connection with Mr. Gavin not responding to a particular customer, Mr. Pizoli wrote "I am a little

disappointed as I believed we were making great progress." (Ex. 15 to Def. Br.)

On October 2, 2013, Mr. Gavin failed to attend a product presentation for one of his largest customers, Honeywell.  Mr. Gavin claimed that he was "completed engaged with Honeywell" and "had planned on attending the meeting" but had been catching up on numerous activities from being out [the prior] week," so he decided to allow "other members" of the team, including Joseph Montalbano, to attend the presentation (Pizoli Decl. at ¶ 23; Ex. 18 to Def. Br.)  Mr. Montalbano states that he thought "Pizoli was calling Gavin on the carpet for not attending this Honeywell meeting and creating a lot of unnecessary tension." (Montalbano Decl. at ¶ 27.)  Mr. Montalbano spoke to Mr. Pizoli after the meeting and reminded him that "Gavin had just had major surgery and was having some physical difficulties," so "he should cut Gavin some slack." (Id. at ¶ 31.)

**E. Gavin Is Instructed to Complete Weekly Activity Reports And Subjected to Further Remedial Action**

On October 7, 2013, Mr. Pizoli began requiring Mr. Gavin to complete "weekly activity tracking report[s]" in an effort to help Mr. Gavin with his time management problems. (Ex. B to Def. Br.)  Essentially, Mr. Gavin now had to "take time and document what [he] was doing everyday." (Gavin Dep. 232: 9-10.)  Mr. Gavin believed that Mr. Pizoli required him to complete weekly

activity reports not to address "some time management issues,"
but "to be made uncomfortable." (Def. SUMF ¶ 64; Gavin Dep.
211:22-23.)  Furthermore, imposing the requirement "singled
[him] out to do work that no one else was being asked to do."
(Gavin Dep. 331:21-332:5.)  It also "exacerbated" his back
condition because it "caused [him] to sit in a perched position
over a keyboard typing and inputting details to account for
every minute of every day." (Gavin Decl. at ¶ 384.)

Mr. Gavin further believed that "as time went along . . .
[Mr. Pizoli and Mr. Kantor] were embarrassed to have a disabled
person working." (Gavin Dep. 212:15-19.)  When Mr. Gavin pointed
out to Mr. Pizoli that there is "nothing [he] could ask of [him]
that would be more painful than to be sitting in a perched
position typing reports," Mr. Pizoli simply reacted in a way
that suggested "if you do not do it, you are insubordinate" and
"[would] be terminated." (Gavin Dep. 214:4-16.)  Mr. Gavin
believed that in forcing him to complete weekly activity
reports, defendant "knowingly put [him] in pain and kept [him]
in pain no matter what [he] did, how [he] said it, how [he]
communicated it." (Gavin Dep. 340:13-17.)  In an October 10,
2013 follow-up email, Mr. Pizoli expressed that his intent was
to "make it clear that you understand the seriousness of your
actions and take immediate ownership to correct these
unacceptable behaviors which are impacting your ability to

maintain positive working relationships with dealer customers
and internal members." (Ex. B to Def. Br.)  Mr. Pizoli
acknowledged that Mr. Gavin had been "successful" in terms of
his "percentage of quota" and "awards," but that "How you do
your job is just as important as the What you do in terms of
results." (Id.)  He explained that "in some markets you are not
welcome due to your treatment of other Haworth members," and
"many perceive you as a bully and they are afraid to be honest
with you in fear of taking your business away from them." (Id.)
As a result, Mr. Pizoli gave him a "documented verbal warning"
for violations of SOP 63.10 – Guidelines for Member Behavior and
Conduct for treating customers, dealers, and members in a
discourteous manner. (Id.)  In an October 30, 2013 email from
Mr. Pizoli to Mr. Gavin, in relation to another complaint from a
dealer, Mr. Pizoli reiterated that "you can have good results
(the WHAT) but HOW you got there is the problem when your
relationships with internal and external customers are not
positive and people do not want to work with you." (Ex. 20 to
Def. Br.)

On November 20, 2013, Mr. Pizoli gave Mr. Gavin a Written
Warning for violations of SOP 63.10 in light of "problems
accrued since [the] discussion on October 10, 2013. (Ex. B to
Def. Br).  These included a serious of "unsolicited complaints"
from dealer customers and Haworth members. (Id.)  Additionally,

in late 2013, Mr. Pizoli informed Mr. Gavin that he was "not allowed to go" to Europe with Haworth customer Tyco and that he was "to work with the European team to have them attend the meeting." (Gavin Dep. 285:18-20.)  Mr. Gavin found this denial "extraordinary" because the client "expected to have someone from Haworth who knew what was going on and could advocate for Haworth," and Mr. Gavin thought that he was "the single point of contact" for the client. (Gavin Dep. 286:13-22.)

Then, at the start of 2014, Priscilla St. Jacques-Glusko, a business development manager supporting a number of Mr. Gavin's accounts, was told that she could not support Mr. Gavin's customers on projects that were outside of her geographic sales territory. (Gavin Dep. 332:18 to 334:25.)  Mr. Gavin "was not offered an explanation." (Gavin Dep. at 335:16-19.)  Removing a BDM like this was an "extraordinary situation" that Mr. Gavin "had never experienced . . . in 15 years [at the company]." (Gavin Dep. at 336:12-14.)

According to Mr. Pizoli, Mr. Gavin continued to "display arrogance" and a "disregard for supervision" by making decisions without prior approval on product giveaways and not responding to customer requests. (Ex. C. to Def. Br.)  On February 20, 2014, Mr. Gavin received a Final Written Warning from Mr. Pizoli given a series of further complaints from customers. (Ex. B. to Def. Br.)  Mr. Pizoli put Mr. Gavin on paid administrative leave

11

for two days in order to "submit a letter of commitment plan."
(Id.)

**F. Gavin's Total Disability and Separation from Haworth**

On January 6, 2014, Mr. Gavin's doctor, Dr. Ashwini Sharan,
provided documentations of Mr. Gavin's restrictions to the
Haworth Medical Center, after an in-person appointment. (Gavin
Dep. 136:15-25.)  Dr. Sharan told Mr. Gavin that he should
"cease spending time sitting in a typing position." (Gavin Dep.
137: 7-8.)  On the documentation, Dr. Sharan instructs Mr. Gavin
"to refrain from sitting in a perched position." (Ex. C. to Def.
Br.)  Mr. Gavin called Mr. Pizoli "five minutes after the
appointment and told him "the neurosurgeon does not want me
sitting in a perched position. It is injuring my back and making
the situation I have been describing to you for months now
worse, and he is issuing medical restrictions for this to stop,"
referring to the weekly activity reports. (Def. SUMF ¶ 89.) Mr.
Pizoli advised Mr. Gavin that he was "to continue doing [the
weekly activity] reporting." (Gavin Dep. 288:10-13.)

A few days later, Mr. Gavin called the Haworth Medical
Center to follow up to see if they had received documentation
from Dr. Sharan, but they simply told him "you have to talk to
your manager." (Gavin Dep. 291:5-6.)  On January 17, Mr. Gavin
received a written response from Mr. Pizoli relative to his
medical condition, requiring him to reach out to the Haworth

12

Medical Center to discuss accommodations. (Gavin Dep. 139:18-19; 214:21-24). The message further states: "I researched your request on completing activity report. I do not have a record of receiving any restrictions that may impact your ability to complete your work assignments. The Haworth Medical Center has not received anything from you either. You need to be aware that there is an approval process . . . for any illnesses/injuries that may require a medical leave or any accommodations." (Gavin Dep. 293: 2-6.; Ex. B to Def. Br.)  Mr. Gavin then reached out to Dr. Sharan via phone, but was unable to reach him, so he left a voicemail to make sure the paperwork was sent to the Haworth Medical Center. (Gavin Dep. 293: 15-18.) Mr. Gavin did not take further action as a result of the January 17th email from Mr. Pizoli or a January 19th email from Mr. Kantor because he "felt helpless" and "it was simply a matter of time before [he] was out of the company." (Gavin Dep. 296:24 to 297:1.)

On February 27, 2014, Haworth received a letter from Mr. Gavin's attorney indicating that Mr. Gavin would not return to work until cleared by a medical provider and until a resolution was reached to remediate the "hostile work environment" at Haworth. (Def. SUMF ¶ 108.)

On July 8, 2014, Mr. Gavin's physician, Dr. Peter Corda, sent a letter to Haworth indicating that Mr. Gavin "has a permanent injury to his spine and at this point he is totally

disabled and unable to work with restrictions. (Def. SUMF ¶ 112; Ex. B to Def. Br.)  On August 6, 2014, the Haworth Medical Center for "the first time" received a faxed note from Dr. Sharan's office summarizing Mr. Gavin's January 6, 2014 appointment with him. (Def. SUMF ¶ 113; Decl. of Victoria Barnes at ¶7.)  After Mr. Gavin exhausted his short-term disability that began in early 2014, he applied for and was approved for long-term disability benefits, and he continues to receive long-term disability benefit payments. (Def. SUMF ¶¶ 114, 116.)

Mr. Gavin filed the instant lawsuit against Haworth on December 11, 2014.  His employment was terminated on February 16, 2015. (Def. RSSDF ¶ 25.)

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all

14

reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cnty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252).

## IV. DISCUSSION

The NJLAD prohibits an employer from discriminating in the "terms, conditions, or privileges of employment" on the basis of a person's disability, N.J.S.A. § 10:5-12(a), "unless the handicap precludes the performance of employment." Failla v. City of Passaic, 146 F.3d 149, 153 (3d Cir. 1998) (citing § 10:5-4.1). Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims. Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).

Although the statute prohibits any unlawful employment practice against a handicapped person, the provisions of the

NJLAD do not apply if "the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A 10:5-4.1.  Therefore, although the statute prohibits discriminatory employment practices, "the NJLAD acknowledges the right of the employers to manage their businesses as they see fit." Viscik v. Fowler Equip. Co., 800 A.2d 826, 833 (N.J. 2002)(citing N.J.S.A. 10:5-2.1).

Plaintiff asserts three claims against Defendant, all under the NJLAD: (1) a direct disability discrimination claim (part of Count One), (2) a denial of reasonable accommodation claim (Count Two), and (3) a hostile work environment claim.  The hostile work environment claim is set forth as an aspect of the direct disability discrimination claim on Count One, but it constitutes a legally distinct claim under the NJLAD, which must be dealt with separately.  The Court addresses each in turn.

### A. Summary Judgment is Warranted on Plaintiff's Direct Disability Discrimination Claim (Count One)

For the following reasons, Defendants are entitled to summary judgment on Count One of Plaintiff's Complaint to the extent it alleges a direct disability discrimination claim under the NJLAD.

To establish a prima facie cause of action for disability discrimination under the NJLAD, Mr. Gavin must show that (1) he was disabled within the meaning of the statute, (2) he was

16

otherwise qualified to perform the essential functions of the position of employment, and (3) he suffered an adverse employment action because of the disability. Victor v. State, 952 A.2d 493, 503 (N.J. Super. Ct. App. Div. 2008), aff'd as modified, 4. A.3d 126 (N.J. 2010).  Each of these elements must be shown, including proof of some material adverse change in the terms and conditions of employment. Jones v. Sch. Dist., 198 F.3d 403, 411 (3d Cir. 1999); Victor, 952 A.2d at 504.  The familiar McDonnell Douglas burden-shifting framework applies. Schummer v. Black Bear Dist. LLC, 965 F. Supp. 2d 493, 501 (D.N.J. 2013).

Defendant argues that by not responding to Defendant's argument for summary judgment of his direct disability discrimination claim in his opposition papers, Plaintiff has conceded the issue to Defendant. (Reply Br. at 2.)  The Court is not persuaded by Defendant's argument, because the Court has an independent obligation to determine whether summary judgment is appropriate on any particular point. See, e.g., Harley v. Geithner, No. 07-3559, 2010 WL 3906642, at *9 (D.N.J. Sept. 29, 2010).  Moreover, since the disability discrimination prima facie case is incorporated into a failure to accommodate claim, see infra, Plaintiff does address the prima facie case in his Opposition. (Opp'n at 16.)

Upon independent review of the record, however, the Court is persuaded that summary judgment is appropriate for Plaintiff's direct disability discrimination claim because, upon the facts of record, he cannot meet his initial prima facie burden, as now explained.

Neither party disputes that Plaintiff was disabled within the meaning of the NJLAD. But Defendant argues that (1) Mr. Gavin was unable to perform the essential functions of his job because it is "undisputed that Gavin is permanently disabled and cannot work even with accommodation," and (2) Mr. Gavin did not suffer an adverse employment action since the alleged "singling out" to do work that no one else was asked to do is not a significant change in employment status under the NJLAD. (Def. Br. at 18-21.)

## 1. Essential Functions of the Job

A two-part test is used to determine whether someone is "otherwise qualified" to perform the essential functions of the job. First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998). Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without

reasonable accommodation." Id.  While Defendant is correct that
Mr. Gavin is now "permanently disabled" and "cannot work," the
determination of whether an individual with a disability is
qualified is made "at the time of the employment decision."
Gaul, 134 F.3d at 579 (emphasis added).  Mr. Pizoli returned
from work without restrictions on January 15, 2013, began
requiring Mr. Gavin to complete the weekly activity reports on
October 7, 2013, and Mr. Gavin went on short-term disability on
April 1, 2014.  Therefore, there is a genuine dispute as to
whether Mr. Gavin was qualified to be a Global Accounts Manager
on October 7, 2013, as the parties vehemently disagree about how
commonly Haworth uses the device for remedial action purposes.
Defendant asserts that they have used the report "on nine
occasions" in the past "as a coaching tool to monitor activities
and manage performance problems with members of the field sales
department who, like [Mr. Gavin], perform work in locations far
removed from their direct supervisors, who are therefore unable
to interact with the members in person and observe their daily
activities." (Janet Hayward Decl. at ¶¶ 5-6.)  On the other
hand, Plaintiff presents evidence that "no other veteran
salesperson at Haworth . . . was pressured to prepare such daily
reports," (Joseph Montalbano Decl. at ¶ 37), and that Plaintiff
himself knows of no other person who has been required to
produce weekly activity reports. (Gavin Decl. at ¶ 384.)

19

Defendant's citation to Motley v. New Jersey State Police, 196 F.3d 160, 162 (3d Cir. 1999) to support its argument that Plaintiff was not qualified is not persuasive. There, the court affirmed a granting of summary judgment for defendant because plaintiff police officer had "fail[ed] to adequately reconcile his wholly inconsistent positions." Specifically, in his application for disability benefits, the plaintiff, like Mr. Gavin here, represented that he was "permanently and totally disabled" as a result of an accident on duty. Id. at 1966. The court found this inconsistent with the plaintiff's present claim that he was able to perform the essential functions of the position with or without accommodation. Id. The accident occurred in January 1990, and the plaintiff was denied a promotion later in 1991 and in subsequent years because he did not pass a fitness test. Id. at 162. Clearly, plaintiff in Motley was not qualified at the time of the employment decision (denial of promotion) as the accident permanently disabling him occurred months before before he was up for promotion.

In the case at hand, however, there is a genuine dispute as to whether Mr. Gavin could perform the essential functions of his position with or without reasonable accommodation. There is no question that Defendant was not permanently disabled in October 2013, as his doctor did not state that Mr. Gavin could not perform work of any kind until April 2014. (Def. SUMF ¶

20

111.)  Moreover, Defendant does not dispute that Mr. Gavin's "results" in terms of sales quotas were at minimum satisfactory. (Ex. 20 to Def. Br.)  As a result, Plaintiff has put forth sufficient evidence to raise a genuine dispute of material fact regarding prong two of the <u>prima facie</u> case of disability discrimination.

**2. Adverse Employment Action**

Defendant further argues that Mr. Gavin did not suffer an adverse employment action because the three alleged "singling out" instances – the weekly activity reports, the removal of Mr. Gavin's trusted Business Development Manager, and the denial of Mr. Gavin's request to attend a meeting in Europe – were not significant changes in his employment status.  The Court agrees, for the reasons explained below.

An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 761 (1998).  It must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d. Cir. 2001).  The NJLAD does not define adverse employment action and "there is no bright-line rule for identifying an adverse employment action."

Alotto v. ECSM Utility Contractors, Inc., No. 09-1144, 2010 WL
5186127, at *3 (D.N.J. Dec. 15, 2010) (citations omitted); see
also Victor, 952 A.2d at 499 (explaining that the "proofs
necessary to demonstrate an adverse employment action must be
examined on a case-by-case basis").  In most cases, however, an
adverse employment action "inflicts direct economic harm."
Burlington Indus., 524 U.S. at 762.  Importantly, an employer's
adverse employment action "must rise about something that makes
an employee unhappy, resentful or otherwise cause an incidental
workplace dissatisfaction." Victor, 952 A.2d at 505.

        Defendant argues that imposing the weekly activity report
requirement is not an adverse employment action because it was
simply "[t]aking remedial action to help Gavin overcome
performance problems." (Def. Br. at 21.)  The Court agrees.  Mr.
Gavin does not submit any evidence in the record suggesting that
he was terminated, lost compensation, demoted, or reassigned
because of the requirement to complete these reports.  While
Plaintiff does assert that he was required to complete the
reports "to be made uncomfortable" in that it "singled [him] out
to do work that no one else was being asked to do," that does
not rise to the level of an adverse employment action. (Def.
SUMF ¶ 64; Gavin Dep. 211:22-23; 331:21-332:5.)  Conclusory
statements such as "[t]he keeping of reports . . . undercuts his
ability to freely interact with customers and hinders his

discretionary functioning a thousand fold" are insufficient and fail to create any genuine issue of material fact. (Gavin Decl. at ¶ 367.)

Defendant cites to <u>Robinson v. Horizon Blue Cross Blue Shield of New Jersey</u>, No. 12-2981, 2015 WL 4603647 (D.N.J. July 30, 2015) to support its argument that forcing Mr. Gavin to document his time is not an adverse employment action. (Def. Br. 21-22.) The Court finds this case instructive. There, the court granted summary judgment to Defendants where Plaintiff had asserted gender and race discrimination claims, but Defendants claimed that they terminated Plaintiff because of "ongoing performance issues and repeated unprofessional interactions with co-workers and others." <u>Id.</u> at *1. Plaintiff's supervisor placed him on "Written Performance Counseling" after a series of "accountability and communication issues," and also directed him to prepare "weekly status reports." <u>Id.</u> at *3. Defendants eventually terminated Plaintiff based upon his "performance/communications issues and his failure to take ownership of his behaviors." <u>Id.</u> at *4. While the court held that Plaintiff's eventual termination was an adverse employment action for the purposes of the NJLAD, it also held that "Plaintiff's placement on Written Performance Counseling and his poor performance reviews do <u>not</u> constitute adverse employment actions." <u>Id.</u> at *5 (emphasis added). The court was concerned

23

about "more naked claims of discrimination" and "greater frustration for employers seeking to improve employees' performance" if it were to consider these types of actions "adverse." Id. (citing Reynolds v. Dep't of Army, 439 F. App'x 150, 153 (3d Cir. 2011)).  Plaintiff has therefore failed to demonstrate that the weekly activity report requirement was accompanied by an adverse change in the conditions of his employment.

The Court also agrees that removing Ms. St. Jacques-Glusko from supporting Mr. Gavin's customers and the denial of Mr. Gavin's request to attend a meeting in Europe were not adverse employment actions.  Regarding the former decision, the record indicates that the move was nothing more than something that made Mr. Gavin subjectively unhappy, which is insufficient to create an adverse employment action.  Regarding the latter decision, when asked during his deposition whether he knew who made the decision to prevent him from traveling and on what basis it was made, Mr. Gavin responded "I don't know." (Gavin Dep. 287:1-7.). Additionally, while Mr. Gavin may have been unhappy that he could not attend personally, he does not refute that Haworth had a European team on the ground in Manchester, and again, "[n]ot everything that makes an employee unhappy" constitutes an adverse employment action. Cortes v. Univ. of Med. & Dentistry of New Jersey, 391 F. Supp. 2d 298, 312 (D.N.J.

24

2005).  The Court therefore concludes that Plaintiff has failed
to meet its prima facie case of disability discrimination under
the LAD; thus, summary judgment is warranted.

### B. Summary Judgment is Warranted on Plaintiff's Failure to Accommodate Claim (Count Two)

The Court will also grant summary judgment on Count Two in
the Complaint, Plaintiff's failure to accommodate claim.  Mr.
Gavin alleges that Haworth failed to accommodate his disability
by requiring him to complete the weekly activity reports as part
of the corrective action process.  Although the NJLAD statute
does not specifically address reasonable accommodation, "courts
have uniformly held that the [NJLAD] nevertheless requires an
employer to reasonably accommodate an employee's handicap."
Victor, 952 A.2d at 502 citations omitted).  Under the NJLAD, an
employer must "make a reasonable accommodation to the
limitations of an employee or applicant who is a person with a
disability, unless the employer can demonstrate that the
accommodation would impose an undue hardship."  N.J. Admin.
Code. Tit. 13, § 13-2.5; see also Fitzgerald v. Shore Memorial
Hosp., 92 F. Supp. 3d 214, 237 (D.N.J. 2015).

"To prevail on a failure to accommodate claim, a plaintiff
must first present the prima facie elements required in any
disability discrimination claim." Fitzgerald, 92 F. Supp. 3d at
237. As the Court has already determined, Plaintiff cannot

establish a prima facie case for disability discrimination
because he cannot show that he was subjected to an adverse
employment action.

Plaintiff argues that the NJLAD does not require him to
demonstrate an adverse employment action in order to establish a
failure to accommodate claim. (Pl. Opp'n at 16.)  In Victor v.
State, 203 N.J. 383 (2010), the New Jersey Supreme Court
considered at length when a plaintiff may bring a failure to
accommodate claim where there was no adverse employment action
apart from the failure to accommodate.  Despite its detailed
analysis of the issue and its recognition of the broad remedial
sweep of the NJLAD, the court ultimately declined to decide the
issue. Id. at 422.  Courts applying New Jersey law since Victor
have continued to consider "adverse employment action" as a
threshold issue. See, e.g., Bull v. United Parcel Serv., Inc.,
620 F. App'x 103, 107 (3d Cir. 2015) ("[a]lthough the New Jersey
Supreme Court may later decide to strike "adverse employment
action" as a distinct element in a failure to accommodate claim,
it has not yet done so"); Zack v. State, Dept. of Labor and
Workforce Development, 2012 WL 832611 (N.J. Super. App. Div.
Mar. 14, 2012) ("[d]espite Victor's legacy of uncertainty, under
prevailing legal standards, the third element of a prima facie
[case] for employment discrimination based on disability
requires plaintiff to show she suffered an adverse employment

action due to her handicap"). Therefore, an adverse employment action remains a required element of a prima facie failure to accommodate claim under the LAD, and as explained supra, Plaintiff cannot satisfy the adverse employment action prong of its prima facie disability discrimination case.

### C. A Genuine Issue of Disputed Fact Prevents Summary Judgment on Plaintiff's Claim That He Was Subjected To a Hostile Work Environment.

Finally, Defendant argues that Mr. Gavin was not subjected to a hostile work environment because Mr. Gavin's subjective beliefs that Mr. Pizoli was motivated by discriminatory animus in deciding how to deal with the many complaints that others made about him is not sufficient, as a matter of law, under the NJLAD. To establish a hostile work environment claim, Mr. Gavin must show that (1) he is disabled, (2) that he was subjected to conduct that would not have occurred but for his disability, and (3) that the conduct was severe or pervasive enough to alter the conditions of employment. Victor v. State, 203 N.J. 383, 409 (2010).

In determining if a work environment is hostile or abusive, courts look to totality of the circumstances, which should include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Mandel v. M & Q

Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) (quoting
Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)); see also
Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005)
("[A] discrimination analysis must concentrate not on individual
incidents, but on the overall scenario."). The "sine qua non of
a hostile work environment claim is a 'workplace . . . permeated
with discriminatory intimidation, ridicule, and insult, that is
sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment.
Fitzgerald, 92 F. Supp. 3d at 240 (citations omitted).

It is the "harassing conduct that must be severe or
pervasive," not its effect. See Lehmann v. Toys R Us, Inc., 626
A.2d 445, 606 (N.J. 1993). However, the court must consider
cumulative effect, keeping in mind "that each successive episode
has its predecessors, that the impact of the separate incidents
may accumulate, and that the work environment created may exceed
the sum of the individual episodes." Lehmann 626 A.2d at 607.
Even where a plaintiff testifies that incidents occurred "every
so often," the cumulative effect of incidents may be enough to
satisfy this prong. Woods-Pirozzi v. Nabisco Foods, 675 A.2d 68,
693 (N.J. Super. Ct. App. Div. 1996).

When an act is done by a supervisor, its severity may be
exacerbated because the supervisor has a unique role in shaping
the work environment. See Taylor v. Metzger, 706 A.2d 685, 691

28

(N.J. Super Ct. App. Div. 1998); see also Leonard v. Metropolitan Life Ins. Co., 723 A.2d 1007, 1011 (N.J. Super. Ct. App. Div. 1999)("the severity of the remarks was underscored by the fact that they were uttered by plaintiff's supervisor").

Mr. Gavin has put forth sufficient evidence for a fact finder to determine that Defendant's conduct would not have occurred but for Plaintiff's disability, and that it was severe or pervasive.  First, Defendant argues that Mr. Gavin's "subjective belief" that the requirement of weekly activity reports, reassignment of Ms. St. Jacques-Glusko, and denial of the trip to Europe were all "taken because he was disabled" is insufficient as a matter of law. (Def. Br. at 36.)  The Court disagrees.  Mr. Pizoli, as supervisor, was aware of Mr. Gavin's back problems as early as October 2012, specifically that he had to wear a "large brace" and could not travel. (Ex. U to Pl.'s Opp'n.)  Mr. Pizoli's comments directly reference plaintiff's back condition on multiple occasions, as well as the perception that Plaintiff received special attention because of the condition.  Plaintiff therefore sufficiently presents enough evidence in the record for a reasonable jury to conclude Mr. Pizoli's and Haworth's conduct would not have occurred but for Mr. Gavin's disability.  A genuine dispute of material fact thus exists as to this element.

Next, Defendant argues that Mr. Gavin's alleged mistreatment was not severe or pervasive enough to alter the conditions of his employment because he has failed to "demonstrate with objective evidence" that the alleged harassing conduct altered the conditions of his employment. (Def. Br. at 37, 39). Defendant focuses on the weekly activity reports, the reassignment of Ms. St. Jacques-Glusko, and the denial of the trip to Europe, but omits a great deal of other evidence submitted by Plaintiff that raises a genuine dispute of material fact regarding severe or pervasive conduct.

As detailed earlier, starting in August 2012 and continuing through 2013, Mr. Pizoli made a series of comments to Mr. Gavin that could be construed as severe or pervasive.  Mr. Gavin asserts that he experienced "continuous badgering, work performance allegations, demeaning comments about his disability," and "unjustified warnings and write-ups" that "would not have occurred but for his disability." (Pl. Opp'n at 13.)  He also asserts that Mr. Pizoli "made a number of comments while Gavin was on a work transitional program demanding Gavin's full recovery upon his return to full duty." (Id. at 13.)

When Mr. Gavin was cleared to return to work without restriction, Mr. Pizoli made additional comments about his back and how it affected business.  Mr. Pizoli specifically voiced these concerns during a March 2013 meeting with Mr. Gavin and

30

Joseph Norton at Reed Elsevier about Mr. Gavin's ability to be
"able to work normally without this [back condition] being the
center of attention." (Gavin Dep. 148:7-12.)  As Mr. Gavin
explained:

> We'd get in front of a customer. The customer would welcome
> me back. Reed Elsevier is one of those customers. Joseph
> Norton, meeting with them, welcome back, made a decision to
> come back and work with Haworth because of you. How is your
> back? Made comments afterwards about, you know, this
> doesn't look right. Doesn't look good in front of
> customers, you know, such a fuss being made about your
> physical well being, is one of the first times that the
> type of conversation or those kind of remarks were made.

(Id. at 147:8-19).  Mr. Pizoli later commented to Mr. Gavin
that he "should have never come back to work [after the August
2012 surgery]," as the suggestion that Mr. Gavin should "leave"
was a "common refrain." (Id. at 152:17-18; 155:2-3.)  After Mr.
Pizoli imposed the weekly activity report requirement on Mr.
Gavin in October 2013, Mr. Gavin told Mr. Pizoli "that this was
going to cause me an immense amount of discomfort," but  Mr.
Pizoli replied, "if you're not capable of doing this, then, you
know, you will be insubordinate," and "[w]e will terminate you
if you're so disabled." (Id. at 153:1-7.)  Mr. Gavin estimates
that the comments about his disability ranged from "more than
ten" to "less than a hundred." (Id. at 156:4.)

Plaintiff also submits declarations of Joseph Montalbano
and Priscilla St. Jacques-Glusko, Business Development Managers
at Haworth, who describe the contentious relationship between

Mr. Pizoli and Mr. Gavin after the latter returned to work from back surgery.  Mr. Montalbano describes their relationship as "contentious and volatile," and states that Mr. Pizoli "was creating conflict where none existed and this came immediately on the heels of Gavin's surgery." (Montalbano Dec. at ¶¶ 12, 19.)  Mr. Montalbano even called Mr. Pizoli and told him that Mr. Gavin had "just got over an operation and if you're looking to create this type of situation and all kinds of lawsuit then you're doing a great job." (Id. at ¶ 27.)  Mr. Montalbano also discusses an incident where Mr. Pizoli reprimanded Mr. Gavin for giving too many free samples to customer, as he notes that it is "virtually unheard of at Haworth" to make an issue of this, as it is "an expected practice in the industry." (Id. at ¶ 53.) This is not mere "naked speculation concerning the motivation" for a defendant's decision, as Defendant suggests, but an affidavit from a former colleague of Mr. Gavin who could certainly testify from personal experience at trial about the toxic relationship between Mr. Pizoli and Mr. Gavin after returning from back surgery. (Reply Br. at 6).  Mr. Montalbano states that his work "overlapped with some of Gavin's accounts," including Honeywell and Reed Elsevier, so he can speak to what he personally observed regarding those matters. (Montalbano Decl. at ¶ 10.)

Furthermore, the declaration of business development manager Priscilla St. Jacques-Glusko supports of denial of summary judgment regarding a hostile work environment. Glusko worked "directly" with Gavin for "approximately six or seven years," and states that Mr. Pizoli "put a lot of undue pressure on Gavin for no apparent reason." (Ex. O of Pl.'s Br. at 4.) Specifically, she explains that she was "unaware" of the weekly activity reporting practice by Haworth, and it appeared that this was something Mr. Pizoli "originated for Gavin for no apparent reason." (Id.)  She also notes that she never personally heard of any complaints about Mr. Gavin from customers, and they still "often times ask [her] about Gavin, expressing how they miss him." (Id.) Instead, Mr. Pizoli was asking Mr. Gavin to "do things that were out of line and pushing him to undue limits, more than he was physically capable of." (Id. at 5.)

Taking all of these incidents together, a reasonable jury could find that the complained-of incidents of harassment presented by Plaintiff are sufficiently severe and/or pervasive to constitute harassment.  Indeed, these behaviors, if true, go beyond being merely rude or offensive because they were aimed at belittling Plaintiff because of his back condition.  Summary judgment is denied as to this claim.

## V.    CONCLUSION

An accompanying Order will be entered granting in part and denying in part Defendant's motion for summary judgment.


**December 16, 2016**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge